BLOCK COAL AND COKE COMPANY, INC. *v.* ELMER GIBSON.

(*Knoxville,* September Term, 1955.)

Opinion filed December 9, 1955.

W. P. O'NEIL and PAUL CHASTAIN, both of Knoxville, for plaintiff in error.

ROY ASBURY, of LaFollette, and HODGES & DOUGHTY, of Knoxville, for defendant in error.

Mr. Chief Justice Neil delivered the opinion of the Court.

The only question made on this appeal is whether or not the trial judge was in error in deciding an issue of fact. This is a suit under the Workmen's Compensation Law. The question of fact is, was the employee's injury total and permanent or otherwise. The trial judge awarded compensation for total and permanent disability. Now comes the appellant, the employer, who insists that there is no evidence to sustain the finding by the trial court. The issue, one of fact, was not an easy one for decision by Judge Davis. It is more difficult for this Court because we do not have the opportunity of observing the witnesses.

We will refer to the parties as they appeared in the court below, the injured workman as the petitioner, and the employer as the defendant.

Elmer Gibson had worked for the Block Coal Company for several years prior to his injury, and was regarded as a "good workman". The injury is described and referred to as a low-back injury. On the day of the accident the petitioner was at work "tightening up this 90 in the mine". "This 90" is a coal conveyor. He was using a wrench or a pipe in the operation to correct the movement of the coal conveyor. The petitioner suddenly felt a pain in his back and "it come on down to my leg, well,

I didn't know what had happened. I knowed I had hurt it some way.'' He testified that his back got so weak he became sick, but soon resumed his work with the help of three other miners. He was given emergency treatment and was later sent to a Knoxville clinic where he was treated by Dr. C. Sanford Carlson, who was an experienced orthopedic surgeon. He was in and out of this clinic a number of times, continuing to suffer pain. He was finally hospitalized and was operated on by Dr. Carlson for what was thought to be ''a ruptured disc''. It was discovered that he had an enlarged nerve at or near where the spinal column joins the sacrum. The doctor removed a portion of the bony structure and some soft tissue to remove pressure on the nerve. Dr. Carlson testified that this operation was successful. But the petitioner insisted that he continued to suffer pain and was not able to work. In fact he testified he had not been able to work since his injury. He returned to the clinic after the operation and underwent a thorough clinical examination by Dr. Carlson, who did not discover any cause for pain. In an effort to discover the alleged reason for continued pain he was given a myelogram test. This consists of injecting a colored fluid into the spinal column to see, as the result of an X-ray, if there are any obstructions in the nerve centers. This test is recognized by the medical profession as being reasonably accurate and harmless to the patient. No obstructions appeared in the X-ray films. But the petitioner says he still suffers such severe pain in his back and left leg that he is unable to do any kind of work.

Dr. Carl E. Ausmus of Jellico, Tennessee, and who had first examined the petitioner, was unable to account for petitioner's suffering pain otherwise than what he had been told by the petitioner. He endorsed the myelo-

gram test as proper. The counsel propounded a hypothetical question in which he was told of the operation and that thereafter the petitioner continued to have pain ''that the man still continued to suffer with approximately the same amount of severe pain in this left hip and thigh that he had suffered previous to the operations, *would that indicate that this nerve was still enlarged and hadn't went back to normal?*'' (Emphasis ours.)

''A. It would if he were giving a correct and true statement on his subjective findings.

''Q. You say, if he was giving a true and correct statement about his pain and suffering in his hip and thigh, that that would indicate that that nerve was still affected? A. Yes, sir.

''Q. Or still injured? A. Yes, sir.''

Upon further questioning he testified that while he was not a psychiatrist he had known the petitioner a good long while; ''that he is an honest, fine man.''

''Q. And that he is telling you the truth about his pain and suffering? A. I believe that, yes, sir.''

The witness refused to give an opinion as to the extent of petitioner's disability.

Now it appears that Dr. Carlson gave it as his opinion, following numerous physical examinations, the operation and the myelogram test, that petitioner had suffered not more than a ten (10%) per cent disability. He thought the pain experienced, following the operation and removal of pressure on the nerve, was due to a ''ligamentous strain'' and the pain in the back was secondary. Now as heretofore stated, Dr. Carlson was emphatic in stating that the operation was successful.

The trial judge, upon consideration of the entire record, expressed it as his opinion that ''the operation was not successful, at least not entirely successful.''

While the trial judge did not discredit Dr. Carlson directly, he felt that since the petitioner was not malingering and "was a good man" as stated by Dr. Ausmus, that this was enough to carry the burden of proof, and especially since Dr. Carlson had testified, as follows:

"Q. In other words, anything about this patient, his actions, what he told you then about his pain and suffering and his ability to do work without having pain, was there any thing that would indicate to you that he was finegling or wasn't telling you the truth? A. No. sir. I felt that he was telling me the truth."

The learned trial judge evidently felt that the petitioner had not been relieved by the surgical operation. And we think, if he is to be believed, that is he still suffers severe pain, then his statement must be given reasonable credence. Moreover if Doctors Ausmus and Carlson felt that petitioner "was telling the truth", this could not be discarded in deciding the issue upon the preponderance of all the evidence. In other words, if these two able doctors felt that the petitioner "was telling the truth," why should the trial judge decide the issue upon the theory that he was a malingerer?

 Generally speaking we cannot, and do not, try an issue such as this *de novo*. If there is any material evidence to sustain the judgment of the trial court, it must be affirmed.

The question here raised was fully considered in *Armstrong Construction Co.* v. *Sams,* 197 Tenn. 208, 270 S .W. (2d) 561, 563. Contention was there made that the petitioner and his lay witnesses were "self-serving" as to the extent of his injuries, and that the testimony of trained medical experts alone was qualified and that they were in

a position to know about the cause or extent of the injuries. Speaking to that point, it was said:

"We think the courts have given medical experts a good deal of latitude in expressing their opinion as to causes of injuries. Such experts, men of great learning, are an invaluable aid to the court in an effort to arrive at the truth in any given case. But in no case have we gone so far as to hold that an expert's opinion is determinative of the issue."

In the instant case, while the preponderance of the evidence may be slight in favor of the petitioner, considering his interest, nevertheless the finding of the trial judge was not a matter of guess-work from a legal or factual standpoint. It must be adjudged as the law of the case unless we can find it to be erroneous within the framework of the law. Upon the issue before us the laboring oar is upon the appellant to show wherein the judgment of the court below should be held erroneous. In this regard we think the appellant has failed.

The judgment of the trial court is affirmed, and the case remanded for its final enforcement.