Roxie Smith, Petitioner,

*v.*

Tennessee Furniture Industries, Inc., Respondent.

369 S. W. 2d 721.

(*Knoxville,* September Term, 1962.)

Opinion filed July 15, 1963.

FRANKLIN PARK, Jefferson City, for petitioner.

PAUL R. CAPPS, DONALD B. OAKLEY, Morristown, for respondent.

MR. SPECIAL JUSTICE ROBERT S. CLEMENT delivered the opinion of the Court.

This is a workmen's compensation case coming to this Court from the Circuit Court of Hamblen County where the Trial Judge found in favor of the Petitioner and allowed her one hundred sixty (160) weeks or forty per cent (40%), permanent partial disability to the body as a whole and also certain medical and hospital bills.

The Petition alleges that on June 1, 1962, while in the course of her employment, Petitioner was pushing and lifting cases that weigh approximately ninety (90) to one hundred (100) pounds, when she received a rupture and injured her back. That she experienced sudden, acute pain involving her low back and the lower lumbar spine and that her stomach hurt at the same time; that she told her foreman about receiving these injuries and that he took her home about eleven o'clock in the morning, al-

though her shift was not over until about 4:00 P.M. That she was off from work from the first until the sixth of June; that she went back to work on the 6th of June and worked until the 16th of June, when she was forced to go to a doctor and that she continued to work until the 26th day of June, when she was no longer able to work and was admitted to the hospital. Petitioner further states that she advised her boss, Mr. Ramsey, on June 26th, 1962, that she was going to have to go to the hospital and have an operation because of her injuries and that she was hospitalized on July 5, 1962. Petitioner further alleges that since that time she has been unable to work and is totally disabled.

The Defendant, in its amended answer, says that the Petitioner did not give notice, as required by law, that she had sustained an injury in the course of her employment and that the Defendant did not receive actual or constructive notice of the alleged injury, and denies that the Petitioner sustained an injury growing out of and in the course of her employment.

The Defendant relies on the following assignment of errors:

1. The Court erred in finding that the defendant had notice of any injury arising out of and in the course of plaintiff's employment with defendant as required under the Workmen's Compensation Law of Tennessee.

2. The Court erred in finding and holding that the hernia sustained by the plaintiff arose out of and in the course of her said employment and in holding the defendant liable for the medical and hospital bills related thereto.

3. The Court erred in awarding any compensation to plaintiff in this case, she having failed to prove notice of injury as required by the Workmen's Compensation Law.

4. The Court erred in overruling defendant's motion for a new trial.

It, therefore, appears that the main questions involved are whether or not the Petitioner gave proper notice and whether or not her injuries arose out of and in the course of her employment.

The Petitioner testified that she had worked for the Defendant Company for a period of five years and that her duties consisted of "cleaning and pushing cases on the case line" and that there is lifting in her work. In response to a question by her attorney as to what she was doing at the time she was hurt, Petitioner replied:

"A. I was cleaning up a case and when I went down to push it around, I picked it up and I felt something pull in my back, and I got right sick and I went and told Charlie Mullins to go tell Mr. Ramsey that I had to go home.

"Q. Now, who is Charlie Mullins?

"A. He was an inspector boy there and John McGoldie was standing beside him and I told him, I said, 'I am sick,' and I sat down on the case line.

"Q. Did it make you—did you have a sudden pain at that time?

"A. Yes, and when I went in around by the clock to punch out I thought I hit my card, but I didn't hit the card, Charlie Mullins went over there and

punched me out, he said I didn't punch out. I walked on outside, through the finish room door, and walked out and leaned up against some boy's truck. My brother, Jessie Holbert, come out and said to me, Sis, are you sick, and I said, yes. He said, do you want me to take you home, and I said, no, my boss is going to take me home.

"Q. Did your boss take you home on that occasion?

"A. Yes, he did.

"Q. And what time of day—what part of the shift was gone?

"A. I worked until 11:00 that morning.

"Q. Now, what was your boss' name that took you home?

"A. Mr. Ramsey."

On cross examination Petitioner further testified:

"Q. I would like first of all to know if you would please tell me the date of this injury, was it on the 1st, 2nd, 13th, 16th—

"A. It was on the 1st that I first got hurt, and I went to the doctor on the 16th.

"Q. It was on the 1st of June that you told Charlie Mullins, I'm sick, that you then went outside, that Mr. Ramsey came outside and took you home?

"A. He sure did.

"*THE COURT:* Mr. Ramsey, was that her boss?

"*MR. OAKLEY:* Yes, he's her foreman. Then, Mrs.

Smith, I believe you mentioned the name of Charlie Mullins?

"A. Yes, Charlie Mullins went and told Mr. Ramsey that I was sick, that I wanted him to come down there.

"Q. Now, is Mr. Mullins here today?

"A. Not that I know of.

"Q. Now, I believe you mentioned your brother's name, Jessie Holbert?

"A. Jessie Holbert, he come out and offered to take me home that very day.

"Q. And you told him again you were sick?

"A. I told him I was sick and my boss was going to take me home.

"Q. You say you worked until about 11:00 on that day?

"A. Yes sir, I did.

"Q. Now then, Mrs. Smith, when did you next return to work?

"A. I went back to work the day after that, and I went back and I went to the doctor, and I told Mr. Ramsey that I had to have my operation, and he told me, he said, you work on, and I said, I can't go back on the line, and he said, you go back over there and I'll take all the blame if anything happens.

"Q. I believe you stated a moment ago that you told Mr. Ramsey that you needed an operation and you went to see Dr. Davis, and Dr. Davis said to put

you in the hospital that day, which was about the 16th?

"A. Yes.

"Q. And you said, if you would, please, let's wait until we get off on the 4th of July?

"A. That's right."

Petitioner further testified:

"Q. Now, Mrs. Smith, I believe that June 1st was on Friday, am I right?

"A. That's right.

"Q. And then, you went back to work on what, the 4th or 5th, which would be the following Monday that would be on the 4th?

"A. Do you mean after the 4th?

"Q. After you got injured this time and Mr. Ramsey took you home?

"A. Well, I went back—when I got off the last day I worked, it was June 29th.

"Q. No mam, I am speaking particularly now about the occasion when you were caused to leave work and Mr. Ramsey took you home and I think you said you stayed away from work some period of time?

"A. Well, I didn't stay off but about one day after that, I went back to work.

"Q. Well, you went back to work then the following Monday or Tuesday or—?

298

"A. I believe it was the following Wednesday.

"Q. The following Wednesday, which would have been June 6th. All right now—I believe that's all.

"*THE COURT:* Mrs. Smith, you say you injured your back on what day?

"A. On June 1st.

"*THE COURT:* Who did you tell out there that you had injured your back?

"A. I don't know. I just told them I got hurt, my back and my stomach, I didn't say what was wrong, *what caused it.* I went to the doctor and the doctor told me what was wrong with me."

The testimony of Dr. Kemp Davis, Petitioner's physician, is very important in the consideration of this case and his testimony will be quoted in some length.

Dr. Davis testified that the Petitioner was first seen by him on June 16, 1962, at which time she stated that while working at the Tennessee Industries a few days prior to June 16th, while pushing cases, she noticed severe pain in her abdomen and in her lower back, which pain became increasingly worse. That Petitioner was admitted to the hospital once in June and again in July; that in July she had a rupture in the lower part of her abdomen which, she stated, came on a few days prior to June 16th and that her complaints on June 16th, at the first examination, were as follows:

"First, severe pain in the lower abdomen, and severe incapacitating pain of the lower back with numbness into both lower extremities. She also had limitation of motion of the lower back. She stated stiff back and

the pain. The positive physical findings on this case were as follows: First, she had marked limitation of motion of the lower back. She had exquisite tenderness on palpation of the muscles holding the lower back in place. She had tests run on her as far as elevation of both lower extremities. There was limitation of the motion of her legs, it created pain in her lower back. The X-ray revealed evidence of thinning of the disc space between L5 and S1, a slipped disc type of situation in the lower back. So, her diagnosis was as follows: First, a slipped disc of the lower back. Secondly, a rupture or ventral hernia of the lower abdomen.

"Q. Doctor, do you recall the date that you did surgery on this lady?

"A. It was the 18th of July, sir.

"Q. And did she get along well from that?

"A. She has no disability secondary to her hernia, sir, in my opinion.

"Q. How frequently or infrequently have you seen her, Doctor?

"A. I've seen her approximately once weekly since—

"Q. What is her condition at the present time?

"A. Her condition at the present time is as follows: She has marked limitation of motion of the lower back. She has spasm and tenderness of the muscles of the lower back, and in my opinion she has permanent disability secondary to her back.

"Q. Now, in what percent would you say she has a total permanent partial disability?

"A. It is my considered professional opinion that this patient has a 50% permanent disability, secondary to the injury to her back.

"Q. Doctor, as the result of these injuries has she been required and did you prescribe her sleeping on what we call boards?

"A. Yes sir, I did, sir.

"Q. Does this condition cause her much or little pain?

"A. This condition, traditionally, causes pain. When you have a slipped disc at times it is better at other times it is worse, but it's a permanent disability.

"Q. That's all.

"*CROSS EXAMINATION*

"*BY MR. OAKLEY*

"Q. Dr. Davis, I have here a group medical attending physician's statement, and I ask you if you recognize that as your signature?

"A. Yes sir, that is my signature.

"*THE COURT:* Mr. Oakley, did this hernia grow out of any kind of accident out there?

"*MR. OAKLEY:* If the Court please, we insist that it did not, and this is the purpose of this line of testimony.

"*MR. PARK:* Well—

"*THE COURT:* Something else caused it?

"*MR. OAKLEY:* Yes, sir.

*"THE COURT:* All right, go ahead.

*"MR. OAKLEY:* If you please sir, I will read, 'Patient's name, Roxie Smith, Age 42, Nature of sickness or injury (Describe complications, if any), Umbilical hernia. Answer to question #3, Did this sickness or injury arise out of patient's employment? Answer is, no. Nature of surgical or obstetrical procedure, if any (Describe fully), Umbilical Hernioplasty, done on 7/19/62. Date performed, 7/19/62. Charge for this procedure, $150.00. Where performed, Morristown Hamblen Hospital, as an inpatient.' I ask you if that is not your statement in that regard?

"A. That is correct, sir.

"Q. Now then, Doctor, you mentioned 2 periods of hospitalization, one being in July and one being in June, I believe on June 30, Mrs. Roxie Smith was admitted to the hospital?

"A. Yes, sir.

"Q. And at that time another statement for payment under group policy, the same group policy, was filed, 'Name, Roxie Smith,'—please, Doctor, I'm going first to ask you to please identify your signature on that statement?

"A. That is my statement, yes sir.

"Q. Then if you will, if you will read some of this terminology on this paper, I can't do it.

"A. The first is metrorrhagia, which is irregular bleeding from the vagina, and gastro-enteritis is an

inflammation of the gastro intestinal tract, and then the second is a rupture, hernia, umbilical.

"Q. Now, I again ask you, on question #3, 'Did this sickness or injury arise out of her employment,' again 'no' is checked?

"A. That is the statement there and the other, but that is an error."

One of the witnesses called by the Defendant was Ova Lee Jones, an employee of the Department of Employment Security. She testified that on July 18, 1962, which was one day prior to her operation, the Petitioner applied for benefits under the Tennessee Employment Security Act, commonly known as "Unemployment Payments." That one of the things that an applicant certifies to is that the applicant is ready, able and available for work. That subsequent to this initial filing, the Petitioner drew twelve (12) payments and had signed for her 13th, which had been upheld on account of the pending suit.

Another witness who testified for the Defendant was Polly Satterfield, an employee of the Defendant. She testified that part of her duties required the keeping of a log of any and all injuries at the plant and that she had referred to her records for the months of May and June of 1962 and that she did not find a report of an injury sustained by the Petitioner and that if Petitioner had reported such injury it would be listed.

Mrs. Faye McKinney, Assistant Office Manager of the Defendant, testified that it was a part of her duties to be responsible for the payroll and time records of the Company. She presented the time card and time sheet of the Petitioner Roxie Smith, the time card covering

the period beginning Wednesday, May 30, 1962, and ending Tuesday, June 5, 1962. The time card shows that on June 1, 1962, Friday, the Petitioner clocked in at 6:50 A.M., was out for lunch from 12:03 P.M. to 12:50 P.M. and clocked out at 4:00 P.M. in the afternoon. The next two days, Saturday and Sunday, June 2nd and 3rd, there was no work in the plant, but on Monday, June 4th, and Tuesday, June 5th, the Petitioner clocked in at 6:50 A.M. on a Monday and 6:50 A.M. on a Tuesday, out for lunch at the usual time and clocked out at the end of the day at 4:00 P.M. The time sheet further discloses that Petitioner lost no time during the month of May and that she lost only one day during the period ending June 12th; one day during the period ending June 19th and one day during the period ending June 26th, 1962, the date of her last employment.

Charlie Ramsey, who Petitioner says carried her home and who is no longer with the Defendant Company, now lives in the State of North Carolina, testified as follows:

"Q. Now, Mr. Ramsey, did Mrs. Roxie Smith ever report an accidental injury to you in the month of June?

"A. Not that I can recall, No Sir.

"Q. Did she ever report an accidental injury to you as having occurred in the month of May?

"A. No, she had the flu in May.

"Q. Did you ever have occasion to take Mrs. Roxie Smith home from work?

"A. Yes sir, I did.

"Q. All right, state, if you will, when was that?

"A. It was in April.

"Q. Have you ever taken Mrs. Roxie Smith home from work at her request or any other way, for that matter, from the time in April until she left her employment at Tennessee Furniture Industries on June 29th?

"A. No sir."

We quote the more pertinent parts of the Trial Court's findings:

"Gentlemen, this is the case of Mrs. Roxie Smith vs. Tennessee Furniture Industries to recover compensation for an alleged injury, accident and injury that the Petitioner says occurred on or about June 1, 1962, while she was an employee of this Defendant plant.

"The Petitioner stated that she had been working there for some 4 or 5 years, and that on this occasion she sustained an injury by pushing or lifting boxes or crates along a line that moved to another line, or to another place where they were inspected, and that while so doing that she injured her back.

"The Petitioner has an open face, and the Court believes that she detailed truthfully her petition, and she impressed the Court by her testimony in that she didn't testify to anything that was unreasonable. She testified that she told Mr. Ramsey that she was sick at her stomach and had been injured, had injured herself, and he took her home. He says that he took her home, that was in April, and he says that someone talked to him there about this lady, and he could be mistaken, Mrs. Smith swears positively that she was

sick, that she didn't punch her card out by reason of this accidental injury, and that he took her home.

"I think that she has shown sufficient notice without requiring to give written notice of the injury.

"The Court finds that she did sustain an injury arising in and growing out of her employment. I think she is entitled to benefits under the Workmen's Compensation Statute.

"The purpose of the Statute is to let the concern that's got the services of the employee down through the years pay a little something before charity has to step in, that's actually the purpose of the law, and the legislature, in passing the act, required the Courts to construe it liberally in favor of the employee and against the employer in order to meet the ends of justice. It is more of a social welfare statute."

TCA Section 50-1001 reads as follows:

"Notice of injury and claim for compensation.—Every injured employee or his representative shall, immediately upon the occurrence of an injury, or as soon thereafter as is reasonable and practicable, give or cause to be given to the employer who has not actual notice, written notice of the injury, and the employee shall not be entitled to physician's fees nor to any compensation which may have accrued under the provisions of the Workmen's Compensation Law from the date of the accident to the giving of such notice, unless it can be shown that the employer had actual knowledge of the accident; and no compensation shall be payable under the provisions of this law unless such written notice is given the employer within thirty (30) days after the occurrence of the accident, unless reasonable

excuse for failure to give such notice is made to the satisfaction of the tribunal to which the claim for compensation may be presented.''

TCA Section 50-1002 reads as follows:

''Contents of notice—Served personally upon employer or agents.—The notice required to be given of the occurrence of an accident to the employer shall state in plain and simple language the name and address of the employee, the time, place, and nature and cause of the accident resulting in injury or death, and shall be signed by the claimant or by some person in his behalf, or by any one (1) or more of the claimant's dependents if the accident resulted in death to the employee. But no defect or inaccuracy in the notice shall be a bar to compensation, unless the employer can show to the satisfaction of the tribunal in which the matter is pending that he was prejudiced by the failure to give the proper notice, and then only to the extent of such prejudice.

''The notice shall be given personally to the employer or to his agent or agents having charge of the business in working at which the injury was sustained by the employee.''

We will first consider the question as to whether or not there is material evidence to show that proper notice was given the employer, and, if not, was there reasonable excuse for failure to give such notice.

The Petitioner testified that her foreman, Mr. Ramsey, had actual notice of the injury which she complains of on June 1, 1962, in that he carried her home. She further testified that she was unable to clock out and that she

thought she hit her card, but didn't and Charlie Mullins went over there and punched her card. The sworn petition alleges that the injury occurred on June 1st.

Defendant's witness, Mr. Ramsey, testified that the Petitioner did not tell him of an injury and that he did not carry her home on June 1st or at any other time except April of 1962, at which time she was ill. A silent witness, but one whose mechanism cries out loudly in this record, is the time card which shows that Petitioner worked a full day on the first of June, the second of June was on Saturday, the third on Sunday, and Petitioner was back on the job on Monday, the fourth, and Tuesday, the fifth. In fact, she worked almost continuously the entire month of June with the exception of about three days during the latter part of the month.

Dr. Davis, Petitioner's own physician, testified that he first saw Petitioner on June 16th and we cannot help but observe that June 16th fell on a Saturday, which was a day that Petitioner would be off from work. Dr. Davis went into great detail as to Petitioner's complaints and indicated on his first report that Petitioner's sickness or injury did not arise out of the patient's employment. In fact, the record reflects that part of her medical bills were paid by other insurance policies, indicating that her injuries were not covered by workmen's compensation benefits.

■ Many years ago, this Court established the rule, which has been followed consistently, that if there is material evidence to support the findings of the Trial Judge, his findings will not be disturbed on appeal. *Vester Gas Range and Manufacturing Company v. Leonard,* 148 Tenn. 665, 257 S.W. 395; *Bon Air Coal and Iron Corp.*

*v. Johnson,* 153 Tenn. 255, 283 S.W. 477; *Diamond Coal Company v. Jackson,* 156 Tenn. 179, 299 S.W. 802; *Block Coal and Coke Co. v. Gibson,* 199 Tenn. 116, 285 S.W.2d 112; *Atlas Powder Co. v. Grimes,* 200 Tenn. 206, 292 S.W.2d 13; and many others.

The Court has also followed the rule that the question of reasonableness of excuse for failure to give notice required by Statute is one peculiarly for the Trial Judge and when there is material evidence to support his findings on the question such finding is final as far as the Appellate Court is concerned. *Lampley v. St. Paul Mercury Indemnity Co.,* 201 Tenn. 458, 300 S.W.2d 876.

In a recent case of *Aluminum Company of America v. Rogers,* 211 Tenn. 187, 364 S.W.2d 358, 359, this Court held that, while recognizing that this was a question for the Trial Judge, the material evidence rule applies to this issue of fact the same as to other issues of fact. *Brookside Mills v. Harrison,* 158 Tenn. 86, 11 S.W.2d 679; *Marshall Construction Co. v. Russell,* 163 Tenn. 410, 43 S.W.2d 208; and *York v. Federal Chemical Co.,* 188 Tenn. 63, 216 S.W.2d 725.

We have reviewed the testimony in this case at great length and have copied an unusual amount of same in this opinion in order to make a final determination of the matter.

As heretofore stated, the finding of the Trial Judge will not be disturbed if there is material evidence to support his finding. Webster defines "Material"—"Of solid or weighty character, of consequence, important". Black's Law Dictionary defines "Material" as, "important, more or less necessary, having influence or effect, going to the merits, having to do with matter as distin-

guished from form". So, the question recurs, "Is there material evidence to support the findings of the Trial Judge?"

■ Before reaching final determination of this case, we are disposed to comment on the statement of the learned Trial Judge in speaking of the Workmen's Compensation statute wherein he said: "IT IS MORE OF A SOCIAL WELFARE STATUTE". We cannot agree with this statement.

■ We do agree with the Trial Judge that the courts should construe the act liberally in favor of the employee and this Court has so held in numerous cases. he purpose of the Act is set out in the case of *Mathis v. J. L. Forrest and Sons,* 188 Tenn. 128, 216 S.W.2d 967.

"The general purpose of the Compensation Acts is to provide compensation for loss of earning power or capacity sustained by workmen through injuries in industry. * * * One may be physically injured and suffer damages, for which he could recover in an action of tort, but unless the injury to his person affects and diminishes his earning power, he can not recover an award under Compensation Acts."

In the case of *Norton v. Standard Coosa-Thatcher Company,* 203 Tenn. 649, 315 S.W.2d 245, the Court said the Workmen's Compensation Law was passed simply to provide for the disability to the employee occurring under certain specified conditions while such employee is working for the employer.

In the case of *Partee v. Memphis Concrete Pipe Company,* 155 Tenn. 441, 295 S.W. 68, approved by the case of

*Maxwell v. Beck,* 169 Tenn. 315, 87 S.W.2d 564, and other cases, it is said: ·

"The legislation is remedial, intended to burden industry with the responsibility of industrial accident, by requiring compensation for the benefit of injured employees, or, in case of their death by accident, to their dependents, so as to relieve society of the obligation."

As we have said, the statute is not to be given a narrow construction, but should be applied fairly and broadly to accomplish the ends intended.

Nowhere has the Legislature, by law, or the Court, by interpretation, ever held this Act to be a social welfare statute and to so hold is contrary to express purposes and provisions of the Act.

The Act specifically provides that in order for an employee to recover under this Act he must, first, prove that he is an employee; second, that he sustained an accidental injury which has been defined from time to time as being an unusual, fortuitous, or unexpected happening, causing injury and which was accidental in character. See *Morrison v. Tennessee Consolidated Coal Company,* 162 Tenn. 523, 39 S.W.2d 272; third, that such accident and injury grew out of and in the course of his employment; and, finally, that he gave due notice thereof to his employer either in writing or in person, all within the meaning of the various sections of the Act.

In the case of *Willoughby v. Warstler & Egly Bakery, Inc., et al.,* 201 Tenn. 277, 298 S.W.2d 727, this Court, speaking through Justice Tomlinson, held that while giving the Workmen's Compensation Statute an equitable

construction, the Courts must be careful not to enter the field of legislation.

We think that Petitioner's case must stand or fall on the date of the alleged accident, June 1, 1962. She states in her sworn petition that the accident occurred on June 1st, and she so testified. She further testified that about 11:00 A.M. on June 1st, she notified Charlie Mullins, an inspector boy, "to go tell Mr. Ramsey that I had to go home". She further stated that, "I told him I was sick and I sat down on the case line." Continuing, Petitioner stated, "Yes, and when I went in around by the clock to punch out, I thought I hit my card, but I didn't hit the card. Charlie Mullins went over there and punched me out. He said I didn't punch out". We have examined the record carefully and no where do we find where the Petitioner testified that she told her foreman, Ramsey, that she had suffered an accident.

Charlie Ramsey, the foreman, testified that she did not give him notice of an accident and the only time he ever carried her home was in April of 1962.

Polly Satterfield, who was called by the Defendant, testified that a part of her duties was to keep a log of all injuries and that she had reviewed the records and she did not find that the Petitioner had reported an injury.

Ova Lee Jones, an employee of the Department of Employment Security, testified that on July 18, 1962, Petitioner filed her claim for unemployment benefits in which she certified that he was ready, able and available to accept employment, and that Petitioner drew twelve checks and a thirteenth had been held up on account of this suit.

Faye McKinney, the Assistant Office Manager for the Defendant, testified that a part of her responsibility was the keeping of the time records for the payroll. She produced the time card of Petitioner for the week beginning Wednesday, May 30, 1962, and ending Tuesday, June 5, 1962. This card disclosed that on June 1, 1962, the Petitioner checked in at 6:50 A.M., out for lunch at 12:03 P.M., back at 12:50 P.M., and out for the day at 4:00 P.M. This mechanical witness cries out strongly against the Petitioner's testimony. The card further discloses that Petitioner worked a full day Monday, June 4th, and Tuesday, June 5th.

Another witness who contradicts Petitioner is her own doctor. Dr. Davis testified that he first saw Petitioner on June 16th and that she gave him a history of having suffered some pain in her abdomen and lower back while pushing cases and that said pain had become increasingly worse. Dr. Davis' records also indicate that her sickness or injury did not arise out of patient's employment.

In the case of *King v. Buckeye Cotton Oil Co.*, 155 Tenn. 491, 296 S.W. 3, 53 A.L.R. 1086, in an opinion by Justice Swiggart, the Court held that, while this Court is bound by the findings of the Trial Judge on the question of fact whenever there is any evidence to sustain the finding, it is not bound by the conclusions drawn from undisputed facts and may reach a different conclusion from that of the Trial Court.

In the case of *York v. Federal Chemical Company*, 188 Tenn. 63, 216 S.W.2d 725, in an opinion by Justice Burnett where notice of actual knowledge of the employee's accident was at issue, this Court held that the burden was on Petitioner to show that notice was given or had been

waived by the conduct of employer in recognition of his liability or was excused by inability or faultless omission of employee.

Quoting from the York opinion, we find: "No valid reason is given for the failure on the part of the employee to give the employer notice of the accident. He kept on with his work for about two weeks and then because it apparently pained him so much he quit work. This was ample time to have given notice and yet he did not do so for more than thirty days thereafter".

One of the more recent cases on the question of notice is *Aluminum Company of Amercia v. Rogers,* 211 Tenn. 187, 364 S.W.2d 358. In this case the employee called in to a superior, stating, "That something had hit me to come up there and I was sick and vomiting". The employee, Rogers, was carried to a first-aid station where a nurse for the company examined him and put him to bed. This case was based on the employee's lowering a tight window while on duty at the guard station and that as a result of this, his pre-existing condition of diabetes was materially aggravated and from which he became totally disabled and finally resulted in his death. The company claimed that they had no notice of this accidental injury alleged to have occurred on March 14, 1958, until the filing of the suit on October 24, 1958. In the Rogers case, the Trial Court found that the alleged injury arose out of employee's employment which aggravated a pre-existing condition and awarded Petitioner full benefits. In reversing and dismissing the Rogers case, Judge Dyer, speaking for this Court, said: "This statute makes the question of reasonableness of the excuse or failure to give written notice one peculiarly for the Trial Judge

but the material evidence rule applies to this issue of fact the same as to other issues of fact".

As we view all of the evidence in the light most favorable to Petitioner, we have reached the conclusion from undisputed facts that there is no material evidence to support the finding of the Trial Judge that the Defendant had actual or constructive notice of an accidental injury suffered by the Petitioner. Nowhere in the record does Petitioner say that she told her foreman, Ramsey, that she had been injured. She testified, "I went and told Charlie Mullins to go tell Mr. Ramsey that I had to go home". The record is silent as to Charlie Mullins. He was not called by either side and no reason was given for his absence.

Again quoting from *Aluminum Company of America v. Rogers,* we re-state from Volume 58 of American Jurisprudence, page 832: "But the employer's knowledge of the fact that an employee became ill while at work does not necessarily of itself charge the employer with notice that such illness constituted or resulted in a compensable injury".

Having reached our decision on the question of notice, it is not necessary to consider the other assignments of error.

The action of the Trial Judge is reversed and the case dismissed.