United Paint Company, Incorporated and United States Fidelity & Guaranty Company,

*v.*

Henry Shand Tillman.

373 S.W. 2d 438

(*Jackson,* April Term, 1963.)

Opinion filed December 5, 1963.

Saul Kay, Jack Clemons, Memphis, for petitioner.

Robert Green, Robert Fargarson, Memphis, for respondents.

188

MR. SPECIAL JUSTICE ROBERT S. CLEMENT delivered the opinion of the Court.

This is a workmen's compensation case coming to this Court from the Chancery Court of Shelby County, where the Chancellor allowed the employee twenty-five (25%) per cent permanent partial disability to the body as a whole and certain medical expenses. The parties will be referred to herein as Petitioner and Defendant, as they appeared in the lower court.

Petitioner claims that he contracted an occupational disease which is compensable under T.C.A. Section 50-1101 of the Workmen's Compensation Act. The Defendant strongly denies that Petitioner suffered an accident within the meaning of the Act.

On June 5, 1961, Petitioner "fell out on the job," and hemorrhaged through his mouth. He was carried to the Company doctor, who made arrangements for a bed at the hospital, where Petitioner was seen by Dr. Emmett Hall, who specializes in thoracic surgery. Dr. Hall examined Petitioner and told him to return the next day, at which time he placed Petitioner in the hospital for two weeks. Petitioner was allowed to go home for a week, after which he returned to the hospital and an operation

was peformed removing the middle lobe of Petitioner's right lung.

Petitioner insists that his lung trouble necessitating the operation was the result of his inhaling fumes and dust in the course of his employment, which Defendant strongly denies. Therefore, we feel it appropriate that the nature of Petitioner's duties be discussed.

Petitioner first went to work for the Defendant in May of 1960. Defendant mixes, manufactures, cans and distributes paint. Petitioner described his duties as mixing pigments and chemicals in a five hundred gallon tank, and that the mixture is composed of many different kinds of chemicals. Petitioner says that on the first day that he worked, he suffered with a bad headache and was unable to work the next day. That after about three months, he developed a constant cough and also broke out with a rash. That when he started to work, he weighed 150 pounds and at the time he first hemorrhaged, he weighed only 115 pounds. Petitioner insists that the fumes and dust which he inhaled while working for Defendant caused his condition and that same is compensable within the meaning of the Workmen's Compensation Act and especially T.C.A. Section 50-1101.

The Defendant insists that there is no material evidence on which the Chancellor could base his finding and award of compensation and that the Chancellor erred in overlooking and refusing to follow undisputed evidence bearing upon the issue of whether Petitioner sustained his injury which arose out of and in the course of his employment.

Dr. E. R. Hall, Jr., who operated on Petitioner, testified that when he first saw Petitioner, he gave a history

of coughing up blood and that his first diagnosis was hematosis. That Petitioner was hospitalized and after a more thorough examination, Dr. Hall's diagnosis was changed to bronchiectasis and that it was necessary to remove the middle lobe of Petitioner's right lung. When asked if working with paint fumes for over a year did, or did not, cause the condition he found, Dr. Hall said: ''I cannot say that the working with the paint did, or did not, cause his condition''.

Dr. Ralph Goldman also testified for Petitioner. Dr. Goldman first saw Petitioner on September 15, 1961, which was after his operation. His testimony was based on the history given him and from his personal examination and observation of the Petitioner over a period of several weeks. Dr. Goldman's testimony covers many pages, but we feel that part of his testimony should be copied herein.

''Q. What significance, if any, Dr. Goldman, do you place on the fact that this patient was working in a paint factory?

''A. He was working around many chemical compounds or chemical compound derivatives which vaporize and which he inhaled, and some people are more sensitive to these chemicals than others, and many patients have been known to develop, as a result of breathing these fumes, a chemical irritation of the lungs, and I think that is what happened here.

''Q. Now, doctor, what connection does that have with chemical pneumonia or with the chemicals he worked with at the paint company?

"A. Well, the constant contact with these chemicals caused the lung tissues to become more and more involved, and the more involved they become, of course, the more difficult it is to treat the condition. When the tissues become diseased and the circulation is interfered with, it is more difficult to treat.

"Q. Doctor, can you state whether or not in the history given you by this patient he acquainted you with the type conditions under which he worked?

"A. Yes.

"Q. State whether or not in your medical opinion there is or not a direct causal connection between the conditions under which he worked and the disease from which he suffers?

"A. Yes, I felt that there certainly could be a definite causal relationship between the two.

"Q. Doctor, what is your opinion as to whether or not there is a direct causal connection between the conditions under which he worked and the disease from which he suffered; that is, what is your opinion, whether it is more likely or not?

"A. I think there is a definite connection between the fumes he breathed and the chronic pneumonia. In other words, I felt that the chronic bronchiectasis with pulmonary insufficiency secondary to chemical irritation of the lungs was the situation.

"Q. Doctor, state whether or not it would be traceable to the employment, could it be traceable to his employment, in other words?

"A. I just stated that I thought there was a direct causal relationship."

The Defendant relies on the testimony of Dr. Duane Carr, an outstanding chest specialist. Dr. Carr examined Petitioner on March 14, 1962, pursuant to a request by Defendant. He did not attend Petitioner previously, but his testimony was based upon the history of the case, his examination of Petitioner, and the record submitted. Dr. Carr's testimony is lengthy, but he sums up his findings wherein he expresses the opinion that to the best of his knowledge none of the chemicals known to be used in the manufacture of paint would produce a chemical burn of bronchial membranes and cause permanent damage to the bronchial tubes. He further testified that a patient who already has a tendency to allergic bronchitis, paint fumes in general will sometimes cause symptoms of choking up and shortness of breath, but this effect is temporary and the swelling of the membranes is comparable to that which occurs in all victims of hay fever. Quoting from his testimony, Dr. Carr said:

"I find nothing in the current examination or review of the Methodist Hospital records to support the hypothesis that the patient's allergic reaction to fumes and chemicals, if any, is the cause of his chronic bronchitis, bronchiectasis and middle lobe syndrome."

The Defendant's only assignment of error, as heretofore stated, is that the Trial Judge erred in overlooking and refusing to follow undisputed evidence bearing upon the issue of whether the Petitioner sustained an injury which arose out of and in the course of his employment.

The Defendant recognizes the rule that in compensation cases the finding of fact of the Trial Court will

not be disturbed on appeal if supported by any material evidence. This rule is supported by numerous cases: *Block Coal and Coke Co. v. Gibson,* 199 Tenn. 116, 285 S.W.2d 112; *Nashville Bridge Co. v. Todd,* 199 Tenn. 311, 286 S.W.2d 861; *Atlas Powder Co. v. Grimes,* 200 Tenn. 206, 292 S.W.2d 13, and many others.

█ In a case of this nature, it is more difficult for the Petitioner to bring himself within the meaning of the Workmen's Compensation Act than if he suffered an accident which was visible to the naked eye. However, T.C.A. Section 50-1101 provides for compensation for certain occupational diseases some of which are designated as lead poisoning, metal fumes fever, silicosis, benzol poisoning, and many others.

In the case of *Smith v. Tennessee Furniture Industries,* 208 Tenn. 608, 348 S.W.2d 290, this Court, speaking through the late Chief Justice Prewitt, upheld an award for compensation where employee worked for a furniture factory and there was evidence finding that employee suffered from bronchitis, tuberculosis and emphysema, the Court holding that an occupational disease had been proven. In the case of *Brooks v. Gilman Paint Company,* 208 Tenn. 595, 347 S.W.2d 665, this Court held that this section of the Code governing occupational diseases should be given a liberal construction.

This matter boils down to which witness the Chancellor chose to accept. In doing this, there is no reflection on the testimony of Dr. Carr, who is an outstanding specialist in his field. In the case of *General Shale Products Corp. v. Casey,* 202 Tenn. 219, 303 S.W.2d 736, this Court, speaking through now Chief Justice Burnett, discussed the question which we have before us in this case.

In the General Shale Products case, the Chancellor had found that Petitioner suffered total and permanent disability by reason of his permanent disablement from silicosis, upon which was imposed tuberculosis. Here, the Trial Judge chose to accept the testimony of Dr. Stedman, a general practitioner, and rejected the testimony of numerous other doctors who were called experts, testifying that Petitioner did not have silicosis. In this opinion, the case of *Graybeal v. Smith,* 189 Tenn. 412, 225 S.W.2d 556, was cited wherein it is stated:

"It seems to us that in a disputed question of fact under testimony of this kind, highly technical, that the trier of facts should be left free to adopt that view which is most consistent with reason and justice."

In the case of *J. E. Greene Co. v. Bennett,* 207 Tenn. 635, 341 S.W.2d 751, this Court held that the Trial Judge is not obligated to accept statements of doctors, but is entitled to examine all evidence in the case, both expert and non-expert, to determine the extent of the disability.

In the case at bar, the Trial Judge accepted the testimony of Dr. Goldman and based his findings upon Dr. Goldman's percentage of disability, which he testified to be 25% or 30% to the body as a whole.

Based upon the foregoing authorities, we must affirm the judgment of the lower court. The costs of the cause are adjudged against Defendant.